UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FAYE WHITLOCK for S.W.,            )
                                   )
            Plaintiff,             )
                                   )
        v.                         )        No. 4:08 CV 656 DDN
                                   )
                                   )
 MICHAEL J. ASTRUE,                )
Commissioner of Social Security,   )
                                   )
            Defendant.             )


**MEMORANDUM**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Faye Whitlock, on behalf of her daughter, S.W., for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. § 401, et seq.  The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).  (Doc. 8.)  For the reasons set forth below, the ALJ's decision is affirmed.


**I.  BACKGROUND**

S.W. was born on April 20, 1993, to Dorean Whitlock and Faye Houston.  (Tr. 78, 585.)  On August 14, 1995, her mother filed for supplemental security income on her behalf.  Whitlock alleged S.W. had speech and language problems, and lead poisoning, and had become disabled in April 1995.  (Tr. 373-76, 462.)  On April 15, 1996, on February 14, 1997, and again on April 7, 1997, Whitlock filed three more applications for supplemental security income on her daughter's behalf, alleging S.W. became disabled on April 20, 1995. (Tr. 377-79, 381-83, 384-90.)  From February 1, 1997, to June 10, 1999, S.W. was found to be disabled and received benefits.  (Tr. 580, 616, 662.)

On October 20, 2000, Whitlock filed a fifth application for supplemental security income on  her daughter's behalf, alleging S.W. became disabled on February 1, 1997.  (Tr. 78-79.)  S.W. received a

notice of disapproved claims on January 9, 2001. (Tr. 44-47.) On April 24, 2001, Whitlock filed a sixth, and the current, application for disability on behalf of her daughter, alleging S.W. became disabled on November 1, 2000.[1] (Tr. 80-81, 437.) She received a notice of disapproved claims on September 20, 2001. (Tr. 48-51.) After a hearing on October 3, 2002, the ALJ denied benefits on December 20, 2002. (Tr. 35-43, 396-426.)

On August 31, 2003, the Appeals Council remanded the case to the ALJ. (Tr. 65.) On remand, the ALJ was to obtain additional records that explained how S.W.'s impairments affected her functioning. (Tr. 66-68.) The ALJ was also ordered to obtain evidence from a medical expert to clarify the nature, duration, and severity of S.W.'s impairments. (Id.) Finally, the ALJ was to further evaluate S.W.'s symptoms, supporting settings, treatment, and functioning. (Id.) After a supplemental hearing on May 3, 2004, the ALJ again denied benefits on June 24, 2004. (Tr. 11-20, 405-15.) On February 1, 2005, the Appeals Council denied plaintiff's request for review. (Tr. 6-8.)

On August 17, 2005, the district court remanded this case under Sentence Four of 42 U.S.C. § 405(g). On remand, the ALJ was to consider whether the plaintiff's impairments met one of the impairments on the Commissioner's list of disabling impairments. The ALJ was also charged with obtaining a mental status consultative examination with psychological testing, obtaining evidence from a medical expert, and recontacting Dr. Vogel for clarification of his opinion. Since this was the second remand in the case, the Appeals Council directed that a different ALJ be assigned to the case. (Tr. 710-17.) After a third hearing on January 19, 2007, the ALJ denied benefits on February 8, 2007. (Tr. 432-42, 814-59.) On March 7, 2008, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 427-29.)

---

[1]In a disability report, Whitlock alleged S.W. became disabled on October 1, 2000. (Tr. 83.)

## II.  MEDICAL HISTORY

On an unknown date, plaintiff Whitlock completed a function report on behalf of S.W.  S.W. had no problems seeing or hearing.  She had some problems  speaking clearly, but Whitlock noted that people who knew her and people who did not know her were able to understand S.W. most of the time.  She was able to read simple words, print some letters, spell three- or four-letter words, and understand money.  She was unable to read capital letters, read and understand simple sentences, write a simple story, add and subtract numbers greater than ten, and tell time.  S.W. did not have any physical limitations, and she got along with her friends and school teachers.  She was able to bathe without help, select her clothes, eat by herself, help around the house, do what she was told, obey safety rules, get to school on time, and accept criticism or correction.  S.W. was able to keep busy on her own, finish things she started, work on art projects, and complete her chores most of the time.  She had trouble completing her homework, and would put it off.  (Tr. 95-104.)

On an unknown date, Whitlock completed a second function report on behalf of S.W.  S.W. had no problems seeing, hearing, or speaking clearly.  S.W. was able to deliver phone messages, repeat stories, tell jokes accurately, talk with family members, and talk with friends.  She was unable to explain why she had done something and use sentences with "because," "what if," or "should have been."  She was able to read simple words, print some letters, print her name, and add and subtract numbers greater than ten.  She was unable to read and understand simple sentences, write in longhand, spell most three- or four-letter words, write a simple story, understand money, and tell time.  S.W. did not have any physical limitations, and she got along with her friends, school teachers, and other adults.  S.W. was able to take care of herself and her personal needs in almost every category.  S.W. was able to keep busy on her own, work on art projects, and complete chores most of the time.  She was unable to finish things she started, and had trouble completing her homework.  Her mother noted her behavior was bad, that she had been suspended three days, and did not listen to her or her teachers.  (Tr. 134-43.)

On October 27, 1995, Robert L. Korn, M.D., conducted a pediatric evaluation. Whitlock's chief concerns were lead intoxication and speech and language problems.[2] When S.W. was two years old, doctors drew blood, and found elevated lead levels. In addition, S.W. could only say a few words. A neurological exam revealed her motor function was good, sensory was intact, reflexes were good, and cranial nerves were intact. Dr. Korn diagnosed S.W. with lead intoxication, by history, speech and language delay, and possible mild slow development. She was in the 25th percentile for weight and close to the 50th percentile for height. (Tr. 487-88.)

On May 6, 1996, Dr. Korn saw S.W. for a pediatric examination. Dr. Korn noted that her speech was impaired and difficult to understand. A neurological examination showed her fine and gross motor skills were at or beyond age level. Dr. Korn diagnosed S.W. with a speech and language impairment. (Tr. 521-22.)

On May 21, 1996, Lori R. Linder, M.A., completed a speech and language evaluation. She found S.W. had a profound phonological disorder, and expressive and receptive language delay. Her speech was highly unintelligible. S.W. also had a history of ear infections. Otherwise, Whitlock noted that S.W.'s development had been normal. (Tr. 526-30.)

On June 15, 1996, Sheila Hostetler, M.A., noted S.W. was a cute female child, but suffered from decreased intelligibility and several misarticulations and phonological errors, as well as impaired receptive and expressive language skills. Hostetler recommended speech and language therapy twice a week, with thirty-minute sessions. Whitlock noted S.W. had a high lead level, and Hostetler believed "this may be contributory to her speech deficit." Hostetler also wanted to slow down

---

[2]Low levels of lead exposure can harm a child's mental development. The health problems get worse as the level of lead in the blood gets higher. Lead is much more harmful to children than adults because it can affect children's developing nerves and brains. The younger the child, the more harmful lead can be. Possible complications include behavior or attention problems, failure at school, hearing problems, kidney damage, reduced IQ, and slowed body growth. Medline Plus, http://www.nlm.nih.gov/MEDLINEPLUS/ency/article/002473.htm (last visited August 18, 2009).

S.W.'s speech rate.  S.W.'s mouth, lips, and nasal cavities all appeared adequate for speech purposes.  (Tr. 532-34.)

On October 3, 1996, laboratory tests showed S.W. had 10 mcg/dL of lead in the blood.  Less than 10 mcg/dL is considered normal.  (Tr. 478.)  On January 3, 1997, laboratory tests showed S.W. had 7 mcg/dL of lead in the blood.  (Tr. 479.)

On January 27, 1997, Sharon Bryant completed a psychological-educational assessment.  S.W.'s speech was difficult to understand, and her test behavior was impulsive.  Her task focus and completion were good.  Her vision, hearing, and overall health were not areas of concern.  She was below age level in fine motor and gross motor skills.  She was below the age level and failed the cognitive screening section.  S.W. took the Stanford-Binet IQ test, and obtained an IQ of 60, which placed her in the mentally deficient range of intellectual functioning.[3]  This IQ score was two and a half standard deviations below the mean.  A report from the St. Louis Children's Hospital indicated S.W. had a decreased attention span and problems with listening skills.  S.W. also performed poorly on the Vineland Adaptive Behavior Scales.  Her scores in communication, socialization, motor skills, and adaptive behavior were all low, and her score in daily living skills was moderately low.  Based on these results, S.W. met the eligibility criteria for early childhood special education.  (Tr. 587-604.)

On February 3, 1997, the Saint Louis Public Schools placed S.W. in the early childhood special education program.  She was also placed in speech and/or language therapy.  (Tr. 606.)

On April 1, 1997, the Social Security Administration found S.W. met the listing requirements for childhood disability, based on the IQ score of 60.  Her disability was made effective for February 1, 1997.  (Tr. 616-18.)

---

[3]An IQ score between 71 and 84 is classified as borderline intellectual functioning.  Hutsell v. Massanari, 259 F.3d 707, 708 n.3 (8th Cir. 2001) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 39-40, 684 (4th ed., American Psychiatric Association 1994)).  An IQ score of about 70 or below is classified as mental retardation.  Id.

On November 3, 1998, S.W. received a psychological educational assessment. The evaluation results indicated S.W. functioned in the low average range of cognitive ability. It appeared S.W. did not meet the eligibility requirements to receive Special Education services, but did meet the eligibility requirements to be diagnosed as speech impaired in the area of articulation. (Tr. 165-69.)

On November 16, 1998, S.W. received an IQ score of 80 on the Stanford-Binet Intelligence Scale, which placed her in the low-average range of functioning. During the IQ test, she showed relative strength in the areas of Quantitative Reasoning, and Short Term Memory. A developmental test of visual-motor integration showed S.W. tested in the second-percentile. A test of her early reading ability and early mathematics ability indicated she was below average in each, in the tenth- and ninth-percentile, respectively. S.W. received a score of 88 on the Vineland Adaptive Behavior scale, which was considered "adequate." (Tr. 685, 698-99.)

In 1999, S.W. received a speech and language re-evaluation. Screening information revealed her voice and fluency were within the average range. Language testing revealed expressive and receptive language skills commensurate with cognitive functioning. S.W. had improved in the area of speech intelligibility, though she still substituted some sounds. (Tr. 148-50.)

On February 11, 1999, the Social Security Administration wrote Whitlock, informing her that she was scheduled for a personal interview, to review S.W.'s receipt of benefits. (Tr. 631-34.)

On March 1, 1999, S.W. was involved in an individual education program (IEP) assessment. S.W. continued to demonstrate sound substitutions, which was interfering with phonics and reading. Her intellectual functioning, based on an IQ test, placed her in the low average range. S.W.'s interpersonal relationships were age and grade appropriate. The IEP team proposed that S.W. be placed in a regular classroom with modifications. Placement in resource was considered to be too restrictive of an environment. (Tr. 690-95.)

On May 26, 1999, S.W.'s kindergarten teacher completed a teacher questionnaire. S.W. had a short attention span, difficulty following

directions, felt insecure, and went to the bathroom often. She had trouble understanding the concept of a sentence, and showed delays in language skills. It was very difficult to understand her written and verbal instructions. There were no physical problems, and S.W.'s functioning increased with one-on-one concepts. (Tr. 672-74.)

On June 1, 1999, Mary Pat Hart, a speech-language pathologist, noted S.W. had a 100% rating of intelligibility in conversational speech. Hart had been giving S.W. articulation therapy, twice a week, for forty-five minutes a week. (Tr. 707-08.)

On June 8, 1999, Sherry Bassi, Ph.D., completed a childhood disability evaluation form for the Social Security Administration. She noted that S.W. had learning disabilities, but that in November 1998, S.W. had received a score of 80 on the Stanford-Binet IQ test. On June 1, 1999, her conversational speech was found to be 100% understandable, though she still suffered from a short attention span, struggled to stay on task, and showed some deficits in self-care activities. (Tr. 668-71.)

On June 10, 1999, the Social Security Administration discontinued S.W.'s receipt of disability benefits. (Tr. 662-63.)

On February 29, 2000, S.W. was involved in an IEP assessment. She was diagnosed as speech impaired. However, her 1st grade teacher placed S.W. at the 1st grade level for reading, spelling, written language, and math. She continued to demonstrate sound substitutions, which interfered with her phonics, reading, and speaking. S.W. was working with a speech and language therapist, and was placed in modified regular education. (Tr. 151-64.)

On October 20, 2000, Whitlock completed a disability report on behalf of S.W. Whitlock noted her daughter could speak English, but suffered from a learning disability, was behind her peers, and was unable to do the work teachers assigned. Whitlock indicated S.W. had not been seen by any doctors for her condition, but that she was being recommended for testing that would place her back in special education classes. At the time of the report, S.W. was in 2nd grade, and was not in special education or speech therapy. She was attending Farragut, which she had been attending since September 1999. (Tr. 82-94.)

On November 9, 2000, Kathie Ellen completed a teacher questionnaire. She was S.W.'s 2nd grade teacher, and had been teaching S.W. for two months. S.W. was not in special education classes. Ellen noted S.W. stayed focused on her tasks until she finished them, and was able to complete the task within the time period. S.W. occasionally needed verbal instructions repeated, but was able to perform tasks with minimal help. S.W. was accepted by her peers, and was respectful and pleasant towards her teachers. S.W. had no behavioral problems. (Tr. 105-07.)

On December 19, 2000, David W. Bailey, Psy. D., completed a childhood disability evaluation form. Dr. Bailey found S.W. had no medically determinable impairment, but noted she was behind her peers and not able to do assigned work. (Tr. 294-97.)

In 2000, S.W. received low marks in reading, language, spelling, mathematics, science, and social studies. Her work in these subject matters did not "show evidence of skill at this time." Her handwriting skills were characterized as "developing." (Tr. 109.)

On February 26, 2001, S.W. underwent a psychological educational assessment. The results showed S.W. functioned in the mildly mentally retarded range of cognitive ability with commensurate adaptive behavior. She had a Verbal IQ of 66, a Performance IQ of 68, and a full scale IQ of 64. Her achievement results indicated she was performing below her grade placement, and these results were consistent with her classroom work, and teacher observations. Results from testing in voice, fluency, and language showed no areas of concern. S.W.'s speech was fluent, and her vocal quality was adequate for her sex and age. Her social and emotional behavior were a concern because she had a short attention span, problems working independently, was impulsive, worked slowly, needed directions repeated, spoke when inappropriate, and lacked self-confidence. Kathie Ellen, her 3rd grade teacher, noted S.W. was "unable to do the work." She appeared to just write letters down at random, without any meaning, did not seem to understand what was told to her, and appeared unable to understand math concepts. S.W. did not have any behavioral problems. (Tr. 177-89.)

On April 24, 2001, Whitlock completed a disability report on behalf of S.W. S.W. was a slow learner, had behavior problems, was hyper active, and had speech problems. Whitlock indicated S.W.'s pediatrician had seen S.W. for these impairments. S.W. was not taking any medication for her impairments, but was in special education and speech therapy classes. (Tr. 123-33.)

On June 3, 2001, Ellen completed a teacher questionnaire. Ellen noted that S.W. was able to concentrate on a subject, but did not seem able to comprehend the subject. S.W. finished all her class work, but her work was not correct and she did not experience any frustration with wrong answers. She was able to follow verbal instructions one step at a time, and one-on-one. S.W. was respectful towards teachers and had few absences. (Tr. 198-200.)

On August 14, 2001, Whitlock brought her daughter to James D. Reid, Ph.D., a licensed psychologist, complaining that S.W. was a slow learner, had behavioral problems, was hyperactive, and had speech problems. S.W. was going into the 3rd grade in regular classes, but with resource pullout. S.W. and the mother both giggled during much of the interview. An examination showed S.W. was coherent, relevant, logical, and cooperative. Her affect was amused and there was no evidence of any preoccupations or hallucinations. Her attention and mental control were adequate. She could count backwards and recite the alphabet without error. Her memory was intact, but her knowledge of current events was impoverished. Dr. Reid did not administer any formal psychometric test of her cognitive abilities. Previous testing had assigned S.W. a full-scale IQ of 64, but Dr. Reid wondered "if the child's giggly behavior and inability to take much seriously affected her scores on intelligence testing." In addition, Dr. Reid noted that the scores did not offer an explanation of why S.W. had decreased intellectual abilities, and he was "not sure that the child is mentally retarded." Dr. Reid believed S.W. had disruptive behavior disorder. Her social functional functioning, concentration, persistence, and pace were normal. Dr. Reid diagnosed S.W. with disruptive behavior disorder and psychological and environmental problems, and assigned her a GAF

score of 75.[4]  Dr. Reid noted S.W. would benefit from highly structured settings with one-on-one supervision and immediate feedback for poor behavior.  He recommended parent education classes for her mother.  (Tr. 298-302.)

On September 5, 2001, Sherry Bassi, Ph.D., completed a childhood disability evaluation form.  Bassi found S.W. had a marked restriction in acquiring and using information, based on her diagnosis of mild mental retardation.  Bassi found S.W. had a less than marked restriction in attending and completing tasks, with her attention within normal limits.  She had no limitation for interacting and relating to others.  She had made significant progress in her articulation.  (Tr. 303-08.)

On September 21, 2001, Mary Pat Hart, a speech language pathologist, noted that S.W. had exited the speech and language therapy program.  (Tr. 201-02.)

On October 9, 2001, S.W. was involved in an IEP assessment.  Her diagnosis was mildly mentally retarded.  Her cognitive functioning was intellectually deficient, with no significant difference between verbal and performance skills.  She had not mastered basic skills in the areas of reading, math, and written expression, and was functioning below her peers.  The placement decision was designated as "Resource" for 3rd grade, and the program decision was designated as "educable mentally handicapped."  The IEP team rejected regular education and modified regular education as "insufficient to address the many and varied academic deficits."  Self-contained instruction was considered too restrictive.  (Tr. 207-23.)

On March 12, 2002, S.W. was involved in an IEP assessment.  Her diagnosis was mental retardation.  S.W. was eight years old at the time,

_____

[4]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function.  A GAF score has two components.  The first component covers symptom severity and the second component covers functioning.  A patient's GAF score represents the worst of the two components.  On the GAF scale, a score of 75 represents transient symptoms, to the extent any symptoms are present (such as difficulty concentrating after a family argument), or no more than slight impairment in social, occupational, or school functioning (such as temporarily falling behind in work).  Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

but reading and writing at a 1st grade level, and doing math at a 2nd grade level.  Evaluation results indicated S.W. functioned in the intellectually deficient range of cognitive functioning.  S.W. had good attendance and attempted all her assignments.  There were no speech, language, hearing, or vision concerns.  The evaluation indicated S.W. had the best chance for success in the small group setting.  She was to be given extended time as an accommodation, with small group testing, in a location with minimal distraction.  The IEP team determined that S.W. was eligible for an extended school year.  S.W. was functioning two and a half years below grade level in reading and writing, and one year below grade level in math.  An extended school year would provide S.W. with the special education necessary to close those deficits.  S.W. had some behavioral issues.  She was very impulsive and talkative in class.  She was also receiving special education instruction (675 minutes) and school counseling (30-minute sessions, 6 to 8 times a year).  She was outside the regular class more than 60% of the time.  (Tr. 224-43.)

On August 22, 2002, S.W. went to Grace Hill Neighborhood Health Center, where she was noted to have longstanding ADHD symptoms.[5]  Robert W. Edmonds, M.D., prescribed Metadate.[6]  There were no signs of physical impairments.  (Tr. 309-10, 313-14.)

On February 3, 2003, S.W. was involved in an IEP assessment.  Her diagnosis was mental retardation.  She was in the 4th grade, but her reading and writing skills were at a 1st grade level, and her math skills were at a 3rd grade level.  She was functioning in the intellectually deficient range of cognitive functioning.  There were no educationally relevant medical findings, though her mother stated she took medication for ADHD.  She was receiving special education

_____

[5]Attention deficit hyperactivity disorder (ADHD) is characterized by symptoms of inattention, hyperactivity, and impulsivity, which have been present for at least six months, and which are disruptive and inappropriate for the person's developmental level.  Diagnostic and Statistical Manual of Mental Disorders, 92-93.

[6]Metadate, or Ritalin, is used to treat attention disorders (such as ADHD), as part of a total treatment plan, including psychological, educational, and social measures.  WebMD, http://www.webmd.com/drugs (last visited August 18, 2009).

instruction (675 minutes), and was outside the regular class between 21% and 60% of the time. The IEP team believed that more time outside of the regular classroom would be too restrictive. S.W. no longer received school counseling because the special education teacher met her needs. (Tr. 271-92.)

On January 23, 2004, Beverly McCainey, a resource teacher, completed a reevaluation report. The report noted S.W. was in a special education program for mental retardation, and that she was outside the regular class between 21% and 60% of the time. S.W. still lagged significantly behind her age level, and was unable to complete grade level tasks in these core subjects. She needed directions repeated constantly to stay on task. Her level of cognitive functioning was in the low average range. She had low self-esteem and required a lot of positive reinforcement. She followed the rules and was respectful to adults. She took medication for ADHD, and there were no other educationally relevant medical concerns at the time. There were no speech and language concerns. Her articulation was age appropriate. S.W. was in the 5th grade at the time. Her diagnosis remained mental retardation. McCainey indicated no additional information was needed. (Tr. 327-30.)

On January 23, 2004, the IEP team completed an assessment for S.W. S.W. was receiving special education instruction (1,000 minutes per week), was in the mental retardation program, and was outside the regular classroom for more than 60% of the time. S.W. was unable to complete grade level content area tasks, she was easily distracted and frustrated, had difficulties with transitions, and was unable to complete assignments without constant teacher support. She was trying her best and had good attendance, but was not showing adequate progress. She was currently in the 5th grade, and was two to three years behind her peers. The IEP team believed that even with a restrictive environment, the regular classroom was inadequate to address S.W.'s academic deficits. Recent report cards indicated unsatisfactory marks in all academic areas, "due highly to her disability and present state of functioning." Results from last year's standardized MAP tests placed S.W. in the bottom percentage of her class - even with several testing

accommodations.  The IEP team recommended S.W. continue to receive 1,000 minutes a week of small group instruction, given her continued "extreme difficulty" in the areas of the academic achievement.  (Tr. 337-52.)

On March 25, 2004, Thomas Vogel, Psy. D., a licensed psychologist, completed a diagnosis of mental impairments.  He noted S.W. had a marked impairment in age-appropriate cognitive or communicative functioning, and deficiencies of concentration, persistence, or pace.  Dr. Vogel noted that these diagnoses were without the benefit of medication.  Dr. Vogel simply checked boxes on the form; there is no medical or psychological examination accompanying the form.  (Tr. 370-72.)

On October 24, 2004, a medical progress noted indicated S.W. was dressed appropriately, comfortable, and pleasant.  During a neurological exam she was alert and oriented, with good eye contact.  Her ADHD was controlled on Concerta.[7]  (Tr. 774.)

On January 31, 2005, a medical progress note indicated S.W. was dressed appropriately, comfortable, and pleasant.  During a neurological exam she was alert, oriented, and normal.  Her ADHD was noted to be controlled on Concerta.  (Tr. 782.)

On March 28, 2005, S.W. was involved in an IEP assessment.  She was experiencing difficulties in the areas of written expression and task completion.  She could not complete grade level content area tasks.  She did not always demonstrate her best effort.  S.W.'s needs were best met in a small group or individualized academic setting.  She was able to get along with her peers, was well-organized, and a diligent worker with excellent attendance.  According to the report, Whitlock was very pleased with S.W.'s academic and social progress, though she wanted to see her daughter's reading skills improve.  Since the last IEP, S.W. had demonstrated improvement in all areas, with "considerable improvement in math and written expression."  S.W. did not have communication needs.  Despite making progress in functioning, S.W. was receiving over 1,400 minutes a week of special education.  She was functioning significantly

---

[7]Concerta is used to treat attention disorders (such as ADHD), as part of a total treatment plan, including psychological, educational, and social measures.  WebMD, http://www.webmd.com/drugs (last visited August 18, 2009).

below her same age peers, and in all subject areas. Due to deficits in reading and mathematics, the IEP team approved S.W. being placed outside of the regular classroom more than 60% of the time. (Tr. 750-64.)

On April 7, 2005, a medical progress note indicated S.W. was dressed appropriately, comfortable, and pleasant. A neurological exam showed S.W. was conversational and normal. She did not have any tremors or tics. Her ADHD was controlled on Concerta. (Tr. 785.)

On September 7, 2005, a medical progress note indicated S.W. was dressed appropriately, comfortable, and pleasant. A neurological exam showed S.W. was polite, alert, and oriented. She did not have any tremors or tics. Her ADHD was controlled on Concerta. (Tr. 790.)

On February 28, 2006, a data collection page from an internal IEP document indicated S.W. was in the mental retardation category and outside the regular classroom 60% of the time. The IEP team did not reevaluate S.W.'s mental capacity, as they considered "the current diagnosis of Mental Retardation [to be] accurate." Terra Nova test scores demonstrated S.W. remained "well below" her peers in the categories of written expression, reading comprehension, and science. According to the IEP assessment, S.W. was close to three years behind her same age peers. She required a small group setting for instructions, and needed to receive information in an elementary form to be able to progress. S.W. was receiving over 1,200 minutes of special education a week. She was able to participate in regular physical education. (Tr. 791-805.)

On April 18, 2006, L. Lynn Mades, Ph.D., a licensed psychologist, conducted a psychological evaluation of S.W. Whitlock complained of ADHD and behavior problems. S.W. denied there were any problems, but admitted to getting in occasional trouble at school. She was in special education, but unsure why she was. S.W. reported that she got quiet and focused when she took her medication. S.W. was reportedly seeing Dr. Vogel and Dr. Evans for counseling and medication. Whitlock said her pregnancy was normal and that S.W. met her developmental milestones within normal time frames. According to school records, S.W. was in the 7th grade, and receiving special education services for learning problems. A mental status examination showed S.W. was well-groomed,

with appropriate hygiene. Her attitude was cooperative and pleasant, and her expression was alert. She was spontaneous, coherent, relevant, and logical. Dr. Mades found no problems with S.W.'s receptive or expressive language abilities. Her speech was normal in rate and rhythm. Her articulation was adequate and developmentally appropriate. Her fine and gross motor development appeared to be within normal limits for her age. Her mood was euthymic, her affect was full and generally appropriate, and no mood disturbances were apparent. Flow of thought was logical and sequential. Her memory for recent and remote events appeared to be within normal limits. (Tr. 740-43.)

During a test of intellectual functioning, S.W. was cooperative and attempted all the items. Her frustration tolerance, and persistence with tasks was fair to good. Her effort appeared to wane at the end of the exam, but no other behavior problems were noted. Her overall effort was good, and her motivation was fair to good. Dr. Mades considered the results to be a valid estimate of her cognitive functioning. On the WISC-IV, S.W. had a full scale IQ of 76, which placed her in the borderline range of ability. Her scores were somewhat scattered, and Dr. Mades believed "her true cognitive potential may be slightly higher than these scores would indicate." S.W. reported attending school, and going places (like the mall), with her friends. She had occasional problems getting along with peers and adults. Dr. Mades diagnosed S.W. with disruptive behavior disorder, with no obvious symptoms, borderline intellectual functioning, and psychosocial and environmental problems. Dr. Mades assigned her a GAF score of 75 to 80.[8] Dr. Mades was unable to diagnose ADHD given S.W.'s behavior during the testing, and because of the relatively few behavioral problems reported at school. She did, however, find evidence of behavioral and learning problems that could limit S.W.'s school participation in a regular classroom. Still, Dr. Mades's prognosis was fair to good with appropriate intervention, and believed S.W.'s school activity would only be mildly affected by any learning or behavior problems at the time. (Tr. 743-45.) Dr. Mades rated S.W.'s ability to follow directions, interact with others,

---

[8]A GAF score of 75 to 80 corresponds to a GAF score of 75. <u>See</u> note 4.

concentrate, use judgment, and communicate as either very good or good. She noted only minimal or mild problems with learning, and no behavior limitations based on the exam, but did reiterate that S.W. suffered from borderline intellectual functioning. (Tr. 746-48.)

On October 20, 2006, the school issued a progress report for S.W.'s first quarter. S.W. received a "S" for "satisfactory," in science, social studies, language arts, and vocal music. Her teacher indicated S.W. was a conscientious worker in social studies and language arts, and that she had shown steady improvement in science. S.W. received an "N" for "needs improvement," in mathematics, computer, and physical education. Her math teacher noted that S.W. was often tardy to class. She did not receive any "unsatisfactory" grades. For the quarter, S.W. had been late to seven periods, and missed four total days of school. (Tr. 806.)

**Testimony at the First Hearing**

On October 3, 2002, Faye Whitlock testified before the ALJ. Her daughter, S.W., was 9 years old, and in the 4th grade. S.W. had previously received supplemental security income in 1999. Whitlock said she had to repeat herself if S.W. was to understand her. S.W. was receiving instruction in small groups, and being tested by two psychologists with the Child Developmental Center at Grace Hill. (Tr. 396-404.)

**Testimony at the Second Hearing**

On May 3, 2004, Whitlock testified before the ALJ. Her daughter, S.W., was 11 years old, and in the 5th grade. She was receiving resource help, but was not in special education. But starting in 6th grade, the school was going to place S.W. in special education. Whitlock believed S.W. was still functioning at the 1st grade or kindergarten level. (Tr. 405-09.)

Whitlock helped her daughter with her homework. S.W. pretended she understood her homework, but her actual answers showed otherwise. She had problems spelling words, telling time, and was unable to multiply, divide, or use fractions. S.W. was able to walk to the bus and take it

to school.  She got along with her peers and did not have any behavioral issues.  She had no physical problems.  S.W. would not cross the street by herself.  (Tr. 409-12.)

S.W. had been seeing Dr. Vogel for about a year.  Dr. Vogel treated S.W. for ADHD, and had been prescribing Ritalin for the past year. Whitlock noticed a difference in S.W.'s behavior when she took her medication, though she also noted that S.W.'s behavior could be unchanged.  Even with the medication, S.W. continued to have problems at school.  S.W. had no problems with her personal care or dressing herself, and she was able to physically function at her age group.  (Tr. 412-15.)

**Testimony at the Third Hearing**

On January 19, 2007, S.W. testified before a new ALJ.  S.W. was now 13 years old and in the 8th grade.  She did not know the size of her clothes, her address, or the ages of her brother or sister, though she knew they were both older than she.  She lived with her brother, sister, mother, aunt, grandmother, and cousin.  S.W. went to Yateman, which was a middle school that also had a high school.  S.W. was not in a regular classroom.  (Tr. 814-25.)

S.W. did her homework at school; the school did not assign work to be done at home.  She was in a classroom with seventeen students and two teachers.  S.W. did not participate in any activities outside of school. She saw Dr. Vogel once a month for medicine, but may or may not have stopped taking it while she was out of school.  (Tr. 825-30.)

S.W. washed dishes at home.  She shared a bedroom with her sister. She did not have any hobbies, but played video games.  She took care of her aunt's dog, feeding it and brushing it.  S.W. was able to dress herself, bathe herself, feed herself, and cook noodles.  She knew how to read a newspaper and write a postcard.  On a typical day, S.W. woke up at 5:00 a.m., and left for school at 6:00 a.m.  Her mother's friend drove her to school, but she walked home.  S.W.'s teachers helped her with math, but she did not need any help with her other course work. (Tr. 830-38.)

Faye Whitlock also testified before the ALJ. She had two other daughters, and one son. Whitlock was married, but separated, and her children did not see their father. The father did not send any child support. Whitlock's income came from a supplemental security income check, and the part-time work she did. Her daughter had been receiving supplemental security income, but was no longer receiving it. Whitlock was living at her sister's place. She thought S.W. deserved benefits because she never saw her daughter's homework. She also acted out in class at times. Dr. Vogel was trying to get S.W. on a "sliding scale," and prescribed her Concerta for her ADHD. Whitlock did not know if her daughter had any other problems. S.W. had reached puberty. (Tr. 839-46.)

Whitlock said S.W. had been talking to herself, and talking as if she was speaking with someone else. She had been doing this for about a year, but Whitlock had not told Dr. Vogel about it. (Tr. 846-48.) S.W. admitted mumbling to herself, but did not know why, though she admitted being lonesome. (Tr. 848-50.)

Clayton Pettipiece, M.D., testified during the hearing. Dr. Pettipiece had a psychiatric practice, and saw children as part of his practice. Dr. Pettipiece was familiar with the regulations, and testified that S.W. had a severe disability, but that her disability did not meet the Secretary's listings. In particular, he found she had ADHD and borderline mental retardation. He believed the medication controlled her ADHD symptoms, and there was no evidence the ADHD was bothering her in school. Dr. Pettipiece stated S.W. had a less than marked limitation in attending and completing tasks, and in acquiring and using information. He based this assessment on her IQ score of 75. She got along with others, and seemed to be doing as well as expected in her special classes. There was no evidence of her being in unusual situations. Dr. Pettipiece considered the special education classes an advantageous situation. Dr. Pettipiece disagreed with the assessment by Dr. Vogel, because Dr. Vogel had based his assessment on the absence of medication. Dr. Pettipiece found S.W. had no limitation in interacting and relating to others, in moving and manipulating objects, in caring for self-domain, and in physical well being. (Tr. 850-55.)

Dr. Pettipiece found S.W.'s ADHD well-controlled with medication, and believed any limitations stemming from the ADHD were less than marked. Dr. Pettipiece did not think S.W. would cope very well if she was in regular classes. In other words, with the accommodations, S.W. was able to function at a less than marked level. If S.W. was in a regular classroom she would not do as well. He added that S.W. was not retarded, and that her IQ had increased over time. She functioned well at school, got along with others, and did not display any destructive behavior. But even without the special accommodations, Dr. Pettipiece did not think her functioning could be classified as marked because "she hasn't functioned in anything other than the way she's functioning now, and she's provided for through the school system with what she needs." (Tr. 855-59.)

### III. DECISION OF THE ALJ

After a review of the entire record, the ALJ found S.W. was not disabled under the Social Security Act. S.W. was in the 8th grade at the time of the hearing, and spent more than 60% of the school day in special education classes. During the hearing, S.W. noted that she was able to get along with others. She was in special education classes for several subjects, and usually did her homework at school. She took her medication, participated in regular gym classes, and was able to feed, dress, and bathe herself. She helped with chores, could read and write, played video games, cared for a dog, went to and from school on her own, and got help from her teachers when necessary. Whitlock testified that her daughter had been suspended once, and had recently increased her Concerta dosage. (Tr. 435-39.)

S.W. saw a psychiatrist or counselor at Grace Hill. During these meetings, S.W. was found to be doing well in school, with her ADHD stable and under control, due to Concerta. There was no indication of any adverse side effects. Whitlock complained that S.W. was not doing her homework and getting poor grades, but S.W. was advanced to the 7th grade without summer school. S.W. passed all vision, hearing, speech and motor skills testing, and had not had any special speech, or language instruction since 1996 - well before her alleged onset date.

Her behavior did not impede her learning. Dr. Mades found S.W. had borderline intellectual functioning, but not mental retardation, and that her cognitive ability could even be higher. Dr. Mades also found insufficient evidence of ADHD. The medical expert testified that the claimant had ADHD and borderline mental retardation, but that she did not have any severe or significantly limiting impairment when she was on her medication. He found no medical reason to suggest S.W. could not perform well outside of her controlled special education classes. (Tr. 439-40.)

Based on this evidence, the ALJ found that S.W. suffered from borderline intellectual functioning and controlled ADHD, but that these impairments, separately or in combination, did not meet the listing requirements. The ALJ also noted that Dr. Mades found S.W.'s IQ scores to all be above the criteria for mentally retarded. In addition, her ADHD was stable and well controlled by medication. There was no credible or documented evidence of S.W. having disciplinary or behavioral problems. There was no credible evidence of S.W. being psychotic or ever talking to herself. She could care for herself and assist with chores. In sum, the ALJ found S.W. had "no physical impairments or limitations, and no apparent adverse side effects from medications." The ALJ determined that S.W. had less than marked limitations in acquiring and using information, and in attending to and completing tasks. The ALJ found S.W. had no limitations in interacting and relating to others, moving about and manipulating objects, and caring for herself. S.W. had no significant physical or health impairments. (Tr. 440-42.)

The ALJ found there was no good explanation for S.W.'s poor grades. Her poor grades could not be blamed on mental retardation, or any other specific learning disorder. The ALJ attributed the poor grades either to uncontrolled ADHD, or simply a general lack of motivation. The ALJ believed S.W. was capable of doing better in school than she had previously done. The allegation that S.W. had a marked or extreme limitation was not credible. As a result, the ALJ determined S.W. was not disabled within the meaning of the Social Security Act. (Id.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To determine whether a child is disabled, the ALJ undertakes a sequential three-step evaluation.  England v. Astrue, 490 F.3d 1017, 1020 (8th Cir. 2007) (citing 20 C.F.R. § 416.924(a)).  At Step One, the ALJ determines whether the child has engaged in substantial gainful activity.  Id.  At Step Two, the ALJ determines whether the child has an impairment or combination of impairments that is severe.  Id.  At Step Three, the ALJ determines whether the impairment or impairments meets or equals the severity of a listed impairment.  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008).

If the ALJ finds that the child's impairment does not meet the severity of a listed impairment, the child may still be disabled if the ALJ concludes that the child's limitations "functionally equal[] the severity of a listed impairment."  Id.  To functionally equal a listed impairment, the child's impairment(s) must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain of functioning.  England, 490 F.3d at 1020 (citing 20 C.F.R. § 416.926a(a)).  There are six domains of functioning: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for oneself; and (vi) health and physical

well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). A child has a marked limitation in a domain if the impairment "interferes seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). An extreme limitation "interferes very seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3). An extreme limitation is reserved for the "worst limitations," though it does not necessarily mean a total lack or loss of ability to function. Id.

When evaluating a child's ability to function in each domain, the Commissioner asks for and considers information that will help to answer the following questions: What activities is the child able to perform? What activities is the child unable to perform? Which of the child's activities are limited or restricted compared to other age-equivalent children who do not have impairments? Where does the child have difficulty with activities - at home, in childcare, at school, or in the community? Does the child have difficulty independently initiating, sustaining, or completing activities? What kind of help does the child need to do activities, how much help is needed, and how often is it needed? 20 C.F.R. § 416.926a(b)(2)(i)-(vi).

These questions are not, singularly or as a whole, the only factors useful to determine whether or not a child has a "marked" or "extreme" limitation. 20 C.F.R. § 416.926a(e)(4)(i). If applicable, test scores can be used in combination with other factors, observations, and evidence to determine the level of impairment. 20 C.F.R. § 416.926a(e)(4)(ii). "Marked" or "extreme" limitations as defined by test scores are not automatically conclusive if additional evidence in the record shows a pattern of behavior inconsistent with those scores. See 20 C.F.R. § 416.926a(e)(4).

## V. DISCUSSION

Whitlock argues the ALJ's decision is not supported by substantial evidence. First, she argues that S.W. met one of the listing requirements. Second, she argues the ALJ failed to consider functional equivalence. In particular, Whitlock argues that her daughter had

marked and severe functional limitations in two domains.  Third, she argues the ALJ failed to properly evaluate the medical evidence.  In particular, she argues the ALJ failed to properly consider S.W.'s lower IQ scores, and failed to properly consider S.W.'s reliance on structured or supportive settings.  (Doc. 21.)


## A.  Listed Impairment: § 1112.05D

Whitlock argues that her daughter's low IQ score, coupled with her severe ADHD, means S.W. satisfied the listing requirement of § 112.05D.

Section 112.05 is the listing for mental retardation, which the regulation characterizes as significant, below average intellectual functioning, with deficits in adaptive functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.05.  To satisfy section D, the claimant must demonstrate a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.05D.

In this case, S.W. failed to satisfy either component of § 112.05D.  In January 1997, S.W. had an IQ score of 60.  In November 1998, her IQ score was 80.  In February 2001, she had a full scale IQ of 64.  In April 2006, Dr. Mades assigned S.W. a full scale IQ of 76.  In January 2007, Dr. Pettipiece testified that S.W.'s IQ score was 75, and that she was not retarded.

Under the regulations, IQ test results must be sufficiently current for an accurate assessment under § 112.05D.  Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 720 n.1 (8th Cir. 2005); Lawrence v. Astrue, No. 8:07-3732-MBS, 2009 WL 890655, at *3 (D.S.C. Mar. 30, 2009).  When the tested IQ is 40 or higher, and the claimant is between 7 and 16 years old at the time of testing, the IQ test should be considered current for two years.  Moore ex rel. Moore, 413 F.3d at 720 n.1; Lawrence, 2009 WL 890655, at *3.  S.W.'s scores of 64 and 60 were not sufficiently current at the time of the ALJ's February 2007 opinion.  Accordingly, the ALJ correctly relied on S.W.'s most recent IQ score of 76, and correctly determined she did not satisfy the IQ requirement of the listing.  See

Bates v. Comm'r of Soc. Sec., Civil Action No. 08-12468, 2009 WL 230604, at *3 n.2 (E.D. Mich. Jan. 29, 2009) (finding a claimant with IQ scores in the lower 80s failed to satisfy listing 112.05).

S.W. also cannot demonstrate the "additional and significant limitation" required by the listing. S.W. argues her ADHD caused her significant and additional limitation of function. Yet, in October 2004, January 2005, April 2005, and September 2005, the medical notes stated S.W.'s ADHD was controlled on Concerta. During the hearing, Dr. Pettipiece testified that he believed the medication controlled S.W.'s ADHD symptoms, and there was no evidence the ADHD was bothering her in school. Because S.W.'s ADHD symptoms were well-controlled with medication, S.W. also failed to satisfy the "additional and significant limitation" required by the listing. See Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003) ("Attention deficit hyperactivity disorder, when controllable by medication, cannot qualify as the required additional and significant limitation under 112.05(D)."). The ALJ properly found that S.W. failed to satisfy § 112.05D.

## B.  Functional Equivalence

Whitlock argues the ALJ failed to consider functional equivalence. In particular, she argues that her daughter has marked and severe functional limitations in two domains: acquiring and using information, and attending to and completing tasks. Finally, Whitlock argues that the regulation on attending to and completing tasks is primarily concerned with school activities.

Of the six domains of functioning, only two are at issue: (i) acquiring and using information; and (ii) attending to and completing tasks.

## Attending to and Completing Tasks

The domain of attending to and completing tasks considers how well a child is able to focus and maintain attention, and how well a child handles activities. Deckard v. Astrue, Civil Action No. H-08-3158, 2009 WL 2486036, at *4 (S.D. Tex. Aug. 6, 2009); 20 C.F.R. § 416.926a(h)(2).

Among school-age children (age 6 to 12), a child should be able to focus her attention to follow directions in various situations, remember and organize school materials, and complete classroom and homework assignments. 20 C.F.R. § 416.926a(h)(2)(iv). The child should also be able to concentrate on details, avoid careless mistakes in her work (beyond what would be expected in her unimpaired peers), be able to change activities or routines without distracting herself or others, and stay on task when appropriate. Id. She should be able to sustain her attention well enough to participate in group sports, read by herself, and complete family chores. Id. Finally, she should also be able to complete a transition task - like being ready for the school bus, changing clothes after gym, or changing classrooms - without extra reminders and accommodation. Id.

Among adolescents (age 12 to 18), the claimant should be able to pay attention to increasingly longer presentations and discussions, maintain concentration while reading textbooks, and independently plan and complete long-range academic projects. 20 C.F.R. § 416.926a(h)(2)(v). The adolescent should also be able to organize materials, and to plan her time in order to complete school tasks and assignments. Id. Finally, she should be able to maintain attention on a task for an extended period of time, and not be unduly distracting to her peers, or unduly distracted by them. Id.

Examples of limited functioning in attending and completing tasks include situations where the claimant: (i) is easily distracted or over reactive to sounds, sights, movements, or touch; (ii) is slow to focus on, or fails to complete activities of interest (such as games or art projects); (iii) becomes repeatedly sidetracked from activities or frequently interrupts others; (iv) becomes easily frustrated and gives up on tasks, including ones she is capable of completing; or (v) requires extra supervision to stay engaged in an activity. Brown ex rel. S.W. v. Astrue, No. 1:05 CV 985 (NAM/RFT), 2008 WL 3200246, at *13 (N.D.N.Y. Aug. 5, 2008); 20 C.F.R. § 416.926a(h)(3)(i)-(v).

The ALJ found S.W. had a less than marked limitation in attending to and completing tasks. Substantial evidence supports this decision. In October 2000, S.W. had advanced to 2nd grade, and was not in special

education classes.  Her 2nd grade teacher noted she stayed focused on her tasks until she finished them, and was able to complete the task within the time period.  In June 2001, her 3rd grade teacher noted S.W. finished all her class work, though her work was incorrect.  In August 2001, Dr. Reid found S.W.'s attention and mental control were adequate, and found her concentration, persistence, and pace were normal.  In September 2001, Dr. Bassi concluded S.W. had a less than marked restriction in attending to and completing tasks, with her attention within normal limits.  Later that month, S.W. exited the speech and language therapy program, after several months of speech therapy.

In January 2004, S.W. had been advanced to the 5th grade, though she was unable to complete grade level tasks.  She was trying her best and had good attendance.  In March 2004, Dr. Vogel found S.W. had deficiencies in concentration, persistence, and pace.  In May 2004, Whitlock noted her daughter was able to walk to the bus and take it to school.  In March 2005, an IEP assessment found S.W. had difficulty completing tasks, and did not always demonstrate her best effort.  Yet, S.W. had demonstrated considerable improvement since her last IEP.  In April 2006, Dr. Mades found S.W.'s frustration tolerance and persistence with tasks was fair to good.  She rated her ability to follow directions, maintain concentration, persistence, or pace, and use judgment as good.  S.W. had been advanced to 7th grade.  In October 2006, her report card indicated she was a conscientious worker in social studies and language arts, and was showing improvement in science.  In January 2007, S.W. testified that she did her homework at school.  She also reported washing dishes at home, feeding and brushing her aunt's dog, and being able to dress, bathe, and feed herself.  She was driven to school, but walked home.  During that hearing, Dr. Pettipiece found S.W. had less than a marked limitation in attending to and completing tasks.  In an undated report, Whitlock noted S.W. could keep busy on her own, and usually completed her chores.

In all, three different psychologists, Dr. Reid, Dr. Bassi, and Dr. Pettipiece, found S.W. had adequate attention, normal concentration, and/or had a less than marked restriction in attending to and completing tasks.  During the hearings, S.W. and her mother testified that she was

able to walk to the school bus, walk home, feed and brush her aunt's dog, do the dishes, and dress, bathe, and feed herself.  See Brown ex rel. J.L.S. v. Astrue, Civil No. 07-5211, 2009 WL 735569, at *7 (W.D. Ark. Mar. 20, 2009) (finding claimant had no limitations in attending to and completing tasks, because he was able to catch the bus in time for school, help in the school library, do household chores, and feed his dog).  Finally, S.W.'s most recent report card indicated she was working hard and showing improvement, and did not have any unsatisfactory grades.  See Hairston ex rel. Rowe v. Barnhart, 54 F. App'x 41, 44 (3d Cir. 2002) (finding claimant had no more than a moderate limitation in completing tasks, because he worked hard, had the ability to pay attention, and had no signs of hyperactivity). Substantial evidence supports the ALJ's finding that S.W. had a less than marked limitation in attending to and completing tasks.

**Acquiring and Using Information**

The ALJ also found S.W. had a less than marked limitation in acquiring and using information.  But as the ALJ noted, even if S.W. had a marked limitation in acquiring and using information, she would not be disabled without another marked limitation.  In other words, unless S.W. had an extreme limitation in acquiring and using information, the ALJ correctly determined that S.W. was not disabled.  See England, 490 F.3d at 1020 (citing 20 C.F.R. § 416.926a(a)).  Examples of limited functioning in acquiring and using information include situations where the claimant: (i) cannot understand words about space, size, or time; (ii) cannot rhyme words or sounds; (iii) has difficulty recalling important things she learned in school the previous day; (iv) has difficulty solving math questions or doing arithmetic; or (v) is unable to talk in short, simple sentences, and has difficulty explaining what she means.  20 C.F.R. § 416.926a(g)(3)(i)-(v).

A child has an "extreme" limitation if that child has a valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure functioning in that domain, and the child's day-to-day functioning in that domain is consistent with that score.  Moore ex rel. Moore, 413 F.3d at 723

(citing 20 C.F.R. § 416.926a(e)(3)(iii)). Under the regulations, the mean IQ score on the Wechsler series is 100, with a standard deviation of 15. Id.; Scales v. Barnhart, 363 F.3d 699, 704 (8th Cir. 2004). A valid IQ score of 55 represents exactly three standard deviations below the mean. Scales, 363 F.3d at 704. In this case, S.W.'s lowest IQ score never fell below 60.

More to the point, S.W.'s daily functioning does not demonstrate an extreme limitation in acquiring and using information. Her mother noted S.W. could speak clearly, tell jokes accurately, repeat stories, and deliver phone messages. In November 1998, she received an IQ score of 80, which placed her in the low-average range of functioning. In February 2000, she was placed in modified regular education. In June 2001, her 3rd grade teacher remarked that she could follow verbal instructions, one step at a time. In August 2001, Dr. Reid found her mental control adequate and her memory intact. He also believed S.W. was not mentally retarded. In September 2001, Dr. Bassi found S.W. had a marked restriction in acquiring and using information. In March 2002, the IEP team noted S.W. was functioning two and a half years below grade level, but only one year below grade level in math. She was receiving special education instruction and counseling. In February 2003, S.W. was three grade levels behind in reading and writing, but still only one grade level behind in math. She was no longer receiving school counseling. In January 2004, the IEP team noted S.W. was unable to complete grade level tasks, was outside the classroom more than 60% of the time, and was unable to complete assignments without constant teacher support. In March 2005, the IEP team noted S.W. had demonstrated improvement in all areas, with considerable improvement in written expression.

In April 2006, Dr. Mades found no problems with S.W.'s receptive or expressive language abilities. Her articulation was adequate and developmentally appropriate. On the WISC-IV test, S.W. had a full scale IQ of 76, and Dr. Mades believed her true cognitive abilities could be even higher. She rated S.W.'s ability to concentrate, follow directions, use judgment, and communicate as good. She noted only minimal or mild problems with learning, and no behavioral limitations.

In October 2006, S.W. did not receive any grades of "unsatisfactory" on a progress report. In January 2007, S.W. testified that she did her homework at school, knew how to read a newspaper, and could write a postcard. Her teachers needed to help her with math, but not with any other course work. Finally, Dr. Pettipiece believed S.W. had a less than marked limitation in acquiring and using information.

Taken as a whole, S.W. had IQ scores in the low-average range, and not even her lowest IQ scores represented scores in the extreme limitation range. Dr. Bassi and Dr. Pettipiece each believed her limitations were less than extreme, while Dr. Reid and Dr. Mades believed she was not mentally retarded. She successfully completed speech and language therapy, received some instruction in regular education, and did not need help outside of math. Under the circumstances, substantial evidence supports the ALJ's conclusion that S.W.'s limitation in acquiring and using information was less than extreme, and that she was not disabled.

## C. Medical Evidence

Whitlock argues the ALJ failed to properly evaluate the medical evidence. In particular, Whitlock argues the ALJ failed to properly consider S.W.'s lower IQ scores, and failed to properly consider S.W.'s reliance on structured or supportive settings.

As noted above, IQ scores of 40 or higher should be considered current for two years. Moore ex rel. Moore, 413 F.3d at 720 n.1; Lawrence, 2009 WL 890655, at *3. At the time of the ALJ's decision, S.W.'s IQ scores of 64 and 60 were not sufficiently current under the regulations. Accordingly, the ALJ did not err in relying on S.W.'s IQ score of 76 from April 2006.

The ALJ's remark about higher scores logically being more accurate than lower scores, may have exceeded the ALJ's qualifications, and may have been improper. At the same time, this one statement was not critical to the ALJ's conclusions; whether the ALJ made the statement or not, the IQ scores from 1997, 1998, and 2001 were still not sufficiently current. See Johnson v. Apfel, 240 F.3d 1145, 1149 (8th Cir.2001) ("Any arguable deficiency . . . in the ALJ's opinion-writing

technique does not require [the reviewing] Court to set aside a finding that is supported by substantial evidence.").

Finally, the ALJ properly considered S.W.'s structured settings in the opinion. In response to questions during the hearing, Dr. Pettipiece testified that even without the special accommodations, he did not think S.W.'s functioning could be classified as marked. The ALJ incorporated this testimony into his final opinion. And as noted above, substantial evidence supports the ALJ's opinion that S.W. had a less than marked limitation in attending to and completing tasks, and had a less than extreme limitation in acquiring and using information. The ALJ properly evaluated the medical evidence.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

    /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 28, 2009.